# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | | |
|---|---|---|
| ELAINE L. CHAO, | ) | |
| Secretary of Labor, | ) | |
| U.S. Department of Labor, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 2:07-CV-68 |
| | ) | |
| HARRIS N.A., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on (1) The Independent Fiduciary's Revised Plan of Distribution, filed on February 13, 2008 [DE 20]; (2) My Smart Benefits, Inc's and Jonathan Hogge's Verified Objection to Revised Plan of Distribution and Request for Additional Time to Review Revised Plan, filed on February 26, 2008 [DE 23]; (3) Objection to Revised Plan of Distribution Direct Benefits LLC, A Utah Limited Liability Company, filed on March 17, 2008 [DE 31]; (4) The Independent Fiduciary's Corrections to Her Submitted Revised Plan of Distribution, filed on April 8, 2008 [DE 41]; (5) My Smart Benefits, Inc's and Jonathan Hogge's Verified Objection to Revised Plan of Distribution and Report Regarding the Plan of Distribution, filed on July 3, 2008 [DE 55]; and (6) Joinder of Direct Benefits, Inc. and Daniel Dixon to Objection of My Smart Benefits, Inc. and Jonathan Hogge, filed on July 28, 2008 [DE 61]. For the reasons set forth

below, the Independent Fiduciary's Revised Plan of Distribution [DE 20], and the Independent Fiduciary's Corrections to her Submitted Revised Plan of Distribution [DE 41] are **REJECTED.** The objections of My Smart Benefits and Jonathan Hogge, which were joined by Direct Benefits, Inc. and Daniel Dixon [DE 23, 55, 61] are **SUSTAINED IN PART** and **OVERRULED IN PART** as set forth more fully in the body of this order. The objections of Direct Benefits and Daniel Dixon [DE 31] are **SUSTAINED.** The Independent Fiduciary shall file her Second Revised Plan of Distribution at her earliest convenience. Any objections by Hogge, My Smart Benefits, Daniel Dixon or Direct Benefits must be filed within 15 days of the Second Revised Plan of Distribution.

BACKGROUND

On March 2, 2007, the United States Department of Labor filed a complaint against Harris, N.A., for alleged violations of the Employee Retirement Income Security Act of 1974 ("ERISA"). The complaint alleges that My Smart Benefits, Inc. ("MSB") was an administrator of individual employer members of the My Smart Benefits, Inc. Dental and Vision Reimbursement Program, and that Mercantile Bank of Indiana (a predecessor of Harris, N.A.) was the depository bank for the payments made by the individual employer members of the MSB Program. Mercantile (now Harris, N.A.) served as a fiduciary to the individual employer members of the MSB Program. MSB ceased operations, and caused $261,604.01 in plan assets to be deposited into a MSB corporate

account at Mercantile Bank. Mercantile Bank then accepted payment from that account to pay off MSB's loan with Mercantile Bank and other expenses.

A consent order and judgment was filed simultaneously with the complaint, and entered by this Court shortly thereafter. The consent order and judgment provides:

> That an independent fiduciary be appointed to receive monies under this judgment, to place them in trust and to process and pay all outstanding claims of, or on behalf of, the employee participants in the various employee welfare benefit plans established by employer clients of MSB.

(Consent Order and Judgment at 2). The consent order and judgment further provides:

> Jeanne Barnes Bryant, J.D., CR, of Receiver Management, Inc. (The Independent Fiduciary) is hereby appointed to receive monies under this judgment, place them in trust process and pay all outstanding claims of, or on behalf of, the employee participants in the various employee welfare benefit plans established by employer clients of MSB.

(Consent Order and Judgment at 3).

The Independent Fiduciary filed her Report of the Independent Fiduciary and Plan of Distribution on August 13, 2007. This plan indicated that the Independent Fiduciary had reviewed 893 claims representing a total gross, unadjudicated amount of $460,828.57, which is considerably more money than the funds available for distribution. Accordingly, the Independent Fiduciary recommended a pro-rata distribution of available assets, which she expected to result in

claimants receiving approximately $.92 on the dollar for their claims.

A Second Report of the Independent Fiduciary and Revised Plan of Distribution was filed on January 9, 2008. In this report, the Independent Fiduciary advised this Court that she received notice of 195 additional unpaid dental claims from employees of the City of Minot, North Dakota, and the Minot School System. Additionally, she had received objections from employers who had paid their employees' dental claims but sought reimbursement of these payments on behalf of their employees. Furthermore, insurance agents who paid claims on behalf of participants were seeking reimbursement. The report indicated that the Independent Fiduciary was in the process of adjudicating these additional claims.

On February 13, 2008, the instant Revised Plan of Distribution was filed. The revised plan of distribution created, for the first time, different classes of claims. Specifically, under the revised plan, Class 1 claims are administrative fees and expenses, Class 2 claims are unpaid participant claims, and Class 3 claims are unpaid claims of employers and others who have paid claims on behalf of participants. After receiving the additional claims, the total unadjudicated amount of claims was calculated as $618,939.00 by the Independent Fiduciary. Her plan adjudicates the Class 2 claims to $334,184.45 and the Class 3 claims to $70,173.26. The Independent Fiduciary reports that, if all participants affected in Class 2 returned their Proof of Claim Form, approximately $.75 on the dollar

would be paid to the claimants. Payment to Class 3 claimants would be dependent on how many individuals in Class 2 filed proof of claim forms. In all likelihood, they would receive little or nothing.

As a result of that proposal, MSB and Jonathan E. Hogge ("Hogge") filed a motion to intervene in this action. MSB and Hogge simultaneously filed their objections to the second revised plan. Magistrate Judge Paul R. Cherry granted MSB and Hogge's motion to intervene on April 21, 2008. Thereafter, MSB and Hogge filed additional objections. Objections were also received from Direct Benefits, LLC ("Direct Benefits"), A Utah Limited Liability Company, and Daniel Dixon ("Dixon"), an insurance Agent with Direct Benefits. Additionally, Direct Benefits and Dixon joined in MSB and Hogge's objections.

In response to the objections, the Independent Fiduciary filed corrections to her submitted revised plan of distribution on April 8, 2008. These corrections include moving a group of claims consisting of claims that one company (Triangle Companies) had paid to Class 3 in an effort to treat these claims similarly to those of Direct Benefits and Dixon. After extended briefing[1], the Independent Fiduciary's Revised Plan of Distribution, as corrected through her April 8, 2008, filing, and the objections thereto, are now fully briefed and ripe for adjudication.

---

[1]Although the briefing in this matter was extended, it was not particularly helpful, consisting mostly of policy arguments and providing very little legal analysis.

DISCUSSION

MSB and Hogge's Objections

MSB and Hogge object to any payment of claims for individuals who are members of groups who had negative ledger balances with MSB (i.e. the employer had not paid enough money into the fund, and thus owed MSB money). MSB and Hogge also object to the lack of precision with which the Independent Fiduciary administered the claims. Each objection will be dealt with separately below.

Payment of Claims where the Employer has a Negative Group Balance

MSB and Hogge contend that the plans they sold were employer funded plans, meaning that the plans are entirely funded by the employers. MSB and Hogge further contend that, where the employer fails to fund its plan, no benefits are payable to the employees enrolled in the plan. In other words, MSB and Hogge have not guaranteed payment in any way. Accordingly, to the extent that the Independent Fiduciary suggests that settlement funds should be used to pay the claims of employees whose employers have not adequately funded their plans, MSB and Hogge object.

The Independent Fiduciary rejects this idea. The Independent Fiduciary takes the position that it is irrelevant to her charge over the claims settlement trust whether an employer group has a positive or negative balance, because her charge is to "pay claims that are unpaid." Additionally, the Independent Fiduciary takes the position

that it is outside her authority to collect accounts receivable on behalf of MSB. With the latter assertion this Court agrees. The Independent Fiduciary was appointed to disburse settlement funds, not to operate as a receiver of MSB. The accounts receivable question, however, does not address the issue of whether claims on accounts that are not properly funded by the employer should receive settlement funds under the consent order and judgment.

One problem the Court faces in addressing this issue is that there is no evidence before the Court on whether all the plans at issue are indeed employer funded plans. MSB and Hogge proceed as if they are, and the Secretary of Labor, Harris, and the Independent Fiduciary do not object to this, although they may not have felt there was a need to object, since they take the position that it is irrelevant. Direct Benefits and Dixon, however, claim that MSB sold two types of benefits: employer-funded plans for which MSB charged a fee to administer, and pooled association plans in which MSB did guarantee benefit payments. No party offers any evidence which substantiates its claims regarding the types of plans at issue here.

Additionally, the Independent Fiduciary fails to explain why claims should be paid under this settlement if the same claims would not have been paid had MSB continued to exist. The Independent Fiduciary admits that her charge is "to pay claims that are unpaid that *should have been paid* under the coverage terms of the MSB plans." [DE 25 at 6, emphasis added]. Yet, the Independent Fiduciary

-7-

apparently feels no obligation to determine whether the claims of individuals whose employers failed to live up to their expectations are claims that "*should have been paid* under the coverage terms of the MSB plans." [DE 25 at 6, emphasis added]. As MSB and Hogge note, "it is only logical that the judgment paid by Harris would be used to compensate claimants damaged by the allegedly improper transaction between Harris and MSB, and not to compensate claimants whose claims remain unpaid for any reason. If an employee/claimant's claim is unpaid based upon the actions of their employer, it is the employer that should bear the loss." [DE 58 at 6].

But, things become even more complicated when the Court considers whether it makes any difference whether the employer is merely deficient in paying fees for MSB's administration of the plan, or whether the employer is deficient in funding the plan itself. And, how troublesome might it be for the Independent Fiduciary to distinguish between the two? Perhaps more so here where Hogge faces criminal allegations of improper commingling of ERISA benefit funds with other corporate funds. Furthermore, what impact do the criminal allegations, yet unproven, that Hogge "fraudulently deducted administrative fees from client accounts at rates of 30% from all accounts beginning in 2003, even though many of the employers by contract were scheduled to pay administrative fee percentages at far lower rates" have on this determination? (See Indictment in Cause No. 2:07-CR-46). Is it even possible for the Independent Fiduciary to

determine whether a "negative" balance on MSB's software is a result of an employer's failure to adequately fund the plan as opposed to Hogge's alleged misdeeds? Is this a duty that should properly fall to the Independent Fiduciary? This is not a criminal trial - it is an attempt to put money in the hands of its rightful owners. And, what about stop-loss insurance? Would the Independent Fiduciary also need to establish whether the employer had purchased stop-loss insurance from MSB (and also whether MSB properly obtained it or failed to do so, as is alleged in the criminal case) and the ramifications of this coverage on the claims? If the duty of determining whether a negative balance should prevent payment were to fall to the Independent Fiduciary, when she finishes sorting out the mess, would there be any funds left, or would the administrative fees associated with this effort result in additional losses for both Hogge and the individual claimants? These are all questions that the many, many briefs in this matter fail to answer.

The question then becomes this: how much longer can this matter pend without significant additional damage to the claimants and Hogge, and what benefit will additional briefing provide? To this end, this Court finds that many of the questions outlined above are simply without clear answers, and that justice is best served by resolving the issues to the best of the Court's ability on the information now before it. Based on that information, this Court finds that Hogge has not adequately supported his objection to the payment of claims where

the employer has failed to adequately fund the account. This is in part because, despite ample opportunity, he has failed to establish with evidence that the plans at issue are employer funded plans. Furthermore, he has failed to account for the allegations of misdeeds pending in his criminal case and how those affect the feasability of his proposal that the Independent Fiduciary exclude claims where the employer has failed to adequately fund its plan. Accordingly, the Independent Fiduciary is directed to proceed with processing claims without regard to the account balance of the employer.

Other Inaccuracies

In addition to their objections regarding the payment of claims where the employer has a negative account balance with MSB, MSB and Hogge claim various other inaccuracies must be remedied. Specifically, they claim that "[a]t least two individuals are to be paid in amounts in excess of the total amount of charges. At least three individuals are to be paid 100% of the amount owed, which is unlikely based upon the plans, which almost always paid a set percentage of the gross amount owed." (DE 23 at 5). MSB and Hogge further claim that, under the Revised Plan, "many claims that should not be paid will be paid, some claimants will be paid more than once, claim amounts will be calculated improperly, and many accounts receivable (which might result in additional funds availability) will

go uncollected and disregarded."[2] (Id.)

It appears that the Independent Fiduciary did the best she could with the information provided to her, but subsequently additional information became available which allows greater accuracy in computation. In fact, the Independent Fiduciary, in her response to MSB and Hogge's objections, notes the following:

> The Independent Fiduciary has acknowledged earlier that unless it was evident in the submitted claim file the particular benefit provisions, the claim was processed using the Conroe School District Plan. Mr. Hogge has pointed out in his Objection the Conroe School District Plan was not a prototypical plan, having only been used by three other employers. If as stated the Conroe School District Plan afforded greater benefits than what a participant's actual plan may have provided, then that might result in a higher recommended reimbursement amount to the participant by the Independent Fiduciary. Without auditing Mr. Hogge's processing, the Independent Fiduciary cannot say Mr. Hogge's claims processing is more accurate than hers; however, to the extent that Mr. Hogge used the correct benefit plan and applied it correctly to each participant, Mr. Hogge's claims processing, in theory, would be more accurate than the Independent Fiduciary's.

[DE 56 at 5].

Similarly, the Independent Fiduciary acknowledges that she did not have prior claims history of the participants available to her. She concedes that, by utilizing a database that includes claims

---

[2] The Court has already disposed of this argument, noting in the previous section that this is not a receivership over MSB, and that accounts receivable owed to MSB fall well outside this litigation, although they may provide a separate avenue of relief to both Hogge and the claimants.

history:

> In cases where a deductible has been met and the benefit maximum has not been exceeded, Mr. Hogge's recommended reimbursement amount will be higher than the Independent Fiduciary's recommended reimbursement amount. In cases where a deductible has not been met or where a deductible has been met but the benefit maximum has been exceeded, Mr. Hogge's recommended reimbursement amount will be lower than that recommended by the Independent Fiduciary. If the prior claims history and claims payment accounting and banking records had been available to the Independent Fiduciary, her claims processing may have been more accurate. However, without auditing Mr. Hogge's claims processing, the Independent Fiduciary cannot say Mr. Hogge's claims processing is more accurate than hers. It can be said, in theory, that if Mr. Hogge's adjustments are based upon paid claims and the application of appropriate plan benefits (deductibles and benefit maximum amounts), Mr. Hogge's processing would be more accurate than the Independent Fiduciary's processing.

[DE 56 at 6].

Likewise, Hogge has recommended that several claims be reduced because either the claim was already paid or the benefit maximum had been exceeded. Apparently conceding that these may be valid reasons to reduce her claims calculations, the Independent Fiduciary notes that "Mr. Hogge has not supported these positions that claims have been paid or benefits maximums have been exceeded with cancelled checks or bank statements."

The question then becomes whether the additional accuracy is worthwhile; namely, does the cost of more accurate computation outweigh the benefit? The risk is, of course, that the administrative

cost associated with additional accuracy will be so great that in the end it will be the claimants who suffer.  But, any damage to the claimants must be balanced against the harm to Hogge as well, who was permitted to intervene in this matter because of his direct, significant, and legally protectable interest related to the property or transaction that is the subject of this action.  It appears that, at this point, Hogge has done most of the work.  Certainly the Independent Fiduciary would have a duty to verify or audit this work in some way, and may in many instances disagree with his assessment of things.  If this Court waits until Hogge and the Independent Fiduciary see eye to eye on all the matters involved in this case, the claimants may never see a penny of the settlement funds, as they may be consumed through administrative costs.  Clearly, there must be some end to this.  Nonetheless, this Court finds that additional claims processing is necessary. Accordingly, MSB and Hogge's objections are **SUSTAINED** to the extent that they seek more accurate claims adjudication, the Independent Fiduciary is **DIRECTED** to utilize the benefit information developed by Hogge to more accurately adjudicate submitted claims; and Hogge is **ORDERED** to promptly provide the Independent Fiduciary supporting bank and accounting information to verify and validate the prior claims history used by him to adjudicate the claims submitted to the Independent Fiduciary.  It is this Court's hope that, for the benefit of the claimants, Hogge and the Independent Fiduciary will work with speed and efficiency.

Direct Benefits, LLC & Daniel Dixon's Objections

Direct Benefits is a Utah limited liability company and Dixon is an insurance agent licensed in the State of Utah. Direct Benefits and Dixon sold an insurance product offered by MSB to employers and their employees in Utah. When Direct Benefits and Dixon learned that MSB was insolvent, they contacted the Utah claimants who had purchased the insurance product through them and paid the unpaid claims of these employees in full. In total, they paid $25,940.92 in claims. In exchange for paying these claims, the participants signed a contract assigning their claims to Direct Benefits and Daniel Dixon. This agreement provided, in relevant part, the following:

> 11. <u>Assignment of Claim</u>. Releasor hereby assigns, transfers and delivers all right, title and interest in and to any claim or benefit that Releasor has or had by reason of My Smart Benefits' actions or omissions, and Releasor further agrees to keep Releasees advised of any and all actions and proceedings of which the Releasors have been advised by reason of their status as claimants against My Smart Benefits or any entity or individual associated therewith. In addition, Releasors agree to apply for and cooperate with in all proceedings designed to reimburse Releasors for their claims and losses and for and in the name of Releasees. The assignment shall operate as an appointment of Releasees as attorney-in-fact for the Releasors for the purpose of applying for and perfecting any and all claims Releasors have or had in connection with their claims against My Smart Benefits. Releasors agree that all such claims shall be processed timely for the benefit of Releasees, and that should Releasors fail to apply for or timely process their claims against My Smart Benefits, they shall owe back to Releasees any and all consideration paid by

>     Releasees to Releasors above.

[DE 31 at 2-3]. Although Direct Benefits and Dixon failed to provide any exhibits verifying that such contracts in fact exist, Dixon has signed the pleading, and this Court has no reason to doubt that such agreements exist.

The Independent Fiduciary, in her revised plan of distribution, relegated the claims of Direct Benefits and Dixon to Class 3, which includes unpaid claims of employers and others who have paid claims on the behalf of participants. Direct Benefits and Dixon object to the Independent Fiduciary's placement of their claims in Class 3, a category which they aptly categorize as "worthless." Their objection is based on two theories. First, Direct Benefits and Dixon claim that their placement in Class 3 violates public policy. Secondly, they claim that the placement of their claims in Class 3 violates private rights of contract.

Regarding their first claim, Direct Benefits and Dixon rely upon the Utah Code Ann. §31A-21-108, which provides that subrogation actions may be brought by the insurer in the name of its insured. Furthermore, they rely upon the fact that the Utah Insurance Code provisions dealing with liquidation and receivership recognizes that an assignee stands in the shoes of and receives the same priority of insured's whose claims have not been paid. This is, according to Direct Benefits and Dixon, designed to promote the voluntary payment of claims by agents and others. The problem with this argument is

that the terms of the consent order and judgment make it clear that this is not, strictly speaking, a subrogation action, a liquidation, or a receivership.

Nonetheless, Direct Benefits and Dixon note that:

> [t]he fact that these Utah Claimants received 100% of their claims does not affect the other members of the class, because any amount paid over and above what they would have received from the Trustee came from the pocket of Direct Benefit and Dan Dixon. Direct Benefit and Dan Dixon took the honorable role by paying benefits that should have been paid by the issuer, My Smart Benefits, Inc. They should accordingly be reimbursed at least at the rate other claimants in Class 2 are paid.

[DE 31 at 4]. In response, the Independent Fiduciary claims that there are legitimate reasons for treating the claims of Direct Benefits and Dixon differently from the claims of individuals who have not had their claims paid by anyone. Specifically, she notes that the consent order and judgment provides that she is to "pay all outstanding claims of, or on behalf of, the employee participants in the various employee welfare benefit plans established by employer clients of MSB." According to the Independent Fiduciary, the claims of those individuals who Direct Benefits and Dixon represent are not "outstanding" and thus are not entitled to receive the same priority. As the Independent Fiduciary notes, "[t]o include claim amounts of participants whose claims are no longer outstanding, but have been paid by another entity works to reduce the pro-rata distributable share available to those participants who had no one to pay their

outstanding claims." While the Independent Fiduciary's concerns are valid, Direct Benefits and Dixon point out that the terms of the consent judgment itself provide that the Independent Fiduciary is to "pay all outstanding claims *of, or on behalf of*, the employee participants..." Those relegated to Class 3 have claims "on behalf of" the employee participants. This Court considers those claims to be "outstanding", although the claimants have been paid, to the extent that MSB has not fulfilled its obligation to pay those claims. Accordingly, this Court concludes that equity favors honoring the claims of all affected, including those who were lucky enough to have someone like Direct Benefits or Dixon step in and cover for MSB's insolvency. Accordingly, Direct Benefits and Dixon's objection is **SUSTAINED** to the extent they seek to be treated the same as those claimants included in Class 2, and the Independent Fiduciary's Second Revised Plan of Distribution should implement this change.

This Court need not reach Direct Benefit and Dixon's claim based on private rights of contract, because this Court finds that equity as well as the language of the consent order and judgment itself dictate that those currently delineated as Class 3 claimants be treated equally to those currently delineated as Class 2 claimants.

Direct Benefits and Dixon also argued that the Independent Fiduciary's decision to treat the claims of Triangle Companies differently from their own, if not corrected, would violate the equal protection clause as an arbitrary and capricious classification

without material justification.  In response to this argument, the Independent Fiduciary acknowledged an error in the treatment of Triangle Companies, and agreed that the subset of Triangle Companies claims that are similar in nature to those of Direct Benefits' and Dixon's should be treated similarly, meaning that she would propose that Triangle Companies also be moved to Class 3.  Because the Independent Fiduciary has acknowledge and corrected this error, and also because this Court has directed that the Class 3 claims (including those of Triangle Companies) be treated the same as Class 2 claims, this objection is **MOOT.**  Direct Benefits and Dixon's argument that the plan of the Independent Fiduciary does harm to the market developed around assigned insurance claim and benefits is also **MOOT.**

CONCLUSION

For the reasons set forth above, the Independent Fiduciary's Revised Plan of Distribution [DE 20], and the Independent Fiduciary's Corrections to her Submitted Revised Plan of Distribution [DE 41] are **REJECTED.**  The objections of My Smart Benefits and Jonathan Hogge, which were joined by Direct Benefits, Inc. and Daniel Dixon [DE 23, 55, 61] are **SUSTAINED IN PART** and **OVERRULED IN PART** as set forth more fully in the body of this order.  The objections of Direct Benefits and Daniel Dixon [DE 31] are **SUSTAINED.**  The Independent Fiduciary shall file her Second Revised Plan of Distribution at her earliest

convenience.  Any objections by Hogge, My Smart Benefits, Daniel Dixon or Direct Benefits must be filed within 15 days of the Second Revised Plan of Distribution.

**DATED: December 8, 2008**                 **/s/RUDY LOZANO, Judge**
                                            **United States District Court**